The court incorporates by reference in this paragraph and adopts as the findings and orders
of this court the document set forth below. This document has been entered electronically
in the record of the United States Bankruptcy Court for the Northern District of Ohio.



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: March 26 2007**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 06-33227 |
| | ) | (Jointly Administered) |
| SAI Holdings Limited, et al., | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

**MEMORANDUM OF DECISION AND ORDER REGARDING
MOTION TO TERMINATE RETIREE BENEFITS**

This case is before the court on a motion [Doc. # 145] for an order under 11 U.S.C. § 1114 authorizing debtor Sandusky Limited to terminate retiree benefits provided for under collective bargaining agreements with Locals 913 and 1957 of the United Automobile, Aerospace and Agricultural Implement Workers of America (collectively, "the Union") filed by SAI Holding Limited ("SAI"), together with its wholly-owned debtor subsidiaries, Sandusky Limited ("Sandusky") and Athol Manufacturing Corp. ("Athol") (collectively, "Debtors"), the Union's response [Doc. # 250], the response of the Official Committee of Unsecured Creditors ("Creditors' Committee") [Doc. # 248], and Debtors' reply [Doc. # 260].[1] The court held an evidentiary hearing on the motion on January 8, 2007. Proceedings to determine

---

[1] In their motion, Debtors also sought to terminate the collective bargaining agreements with Locals 913 and 1957 pursuant to 11 U.S.C. § 1113. However, the hearing did not go forward on the motion as it relates to termination of the collective bargaining agreements as the parties reported that Sandusky and the Union had reached an agreement ("Closing Agreement") regarding the permanent closing of the Sandusky plant and the effects thereof upon the then current employees in the two bargaining units covered by the collective bargaining agreements at issue in the motion. On February 23, 2007, the court entered an order authorizing Sandusky to enter into the Closing Agreement, subject to the conditions and limitations set forth in that order.

whether a debtor should be authorized to terminate retiree benefits under § 1114 directly affect administration of the estate and adjustment of the debtor-creditor relationship and are core proceedings that this court may hear and determine. 28 U.S.C. § 157(b)(2)(A) and (O).

This memorandum of decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this contested matter by Fed. R. Bankr. P. 9014 and 7052. Regardless of whether or not specifically referred to in this decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the following reasons, Debtors' motion will be denied.

## FACTUAL BACKGROUND

Debtors' principal business is the design, manufacture, and marketing of high quality vinyl products to customers primarily in the automotive industry. Athol has a manufacturing facility in Butner, North Carolina, and Sandusky has a manufacturing facility in Sandusky, Ohio. Debtors' principal headquarters are based in Butner, North Carolina. Sandusky's salaried union employees are represented by Local 913 and its hourly employees are represented by Local 1957, both of which are parties to collective bargaining agreements with Sandusky (collectively, the "CBAs"), effective July 1, 2002, through June 30, 2007. Athol employees are represented by a different union.

On November 8, 2006, SAI, Athol and Sandusky each filed voluntary Chapter 11 petitions and requested joint administration of their bankruptcy cases, which the court granted on November 9, 2006. The estates are not substantively consolidated. According to Debtors, they began experiencing financial problems in late 2004. Debtors experienced a net loss on a consolidated basis of $3,847,700 during the nine-month period ending September 30, 2006, $2,174,800 of which is attributed to Sandusky's operations. In its bankruptcy schedules filed on January 2, 2007, Sandusky reports total assets in the amount of $54,084,868, including real property valued at $3,910,000 and personal property valued at $50,174,868, and total liabilities in the amount of $40,290,171, including $27,400,122 in secured debt, $655,307 in unsecured priority debt, and $12,234,741 in general unsecured debt. Notwithstanding the fact that its assets exceed its liabilities by nearly $14 million, Sandusky experienced cash flow problems caused by several factors, including what Debtors describe as uncompetitively high wage and benefit costs and high legacy costs at the Sandusky plant, as compared to more favorable wage and benefit obligations at the Athol plant. As a result, in the exercise of their business judgment, Debtors caused the Sandusky facility to close on

---

[Doc. # 430].

December 22, 2006.

The CBAs to which Sandusky is a party each require that Sandusky provide direct payment or reimbursement for covered medical and prescription drug expenses to approximately 95 retired members of the Union (the "Retirees"). The Retiree benefits are self-funded by Sandusky. However, pursuant to a stock purchase agreement dated October 22, 1992, it receives reimbursement from Chrysler Corporation of benefits paid on behalf of 42 of the Retirees who retired when the Sandusky facility was owned by Chrysler ("Chrysler Retirees"). Edward Siemer, Director of Human Resources for SAI, testified at the hearing that he negotiated the CBAs with the Union and that, under the CBAs, both the Retirees and their spouses are eligible for the above described benefits, and a spouse remains eligible even after the death of the Retiree.[2]

Glen Ogden, from Ogden Benefits Administration, the third-party administrator for the Sandusky benefits plan, also testified at the hearing. Ogden explained that while the Retiree benefit plans are self-funded, they include a stop-loss insurance policy that provides for reimbursement to Sandusky for claims that exceed $125,000 per person. He testified that retiree claims paid by Sandusky during the fifteen month period ending December 31, 2006, including Chrysler Retiree claims, total $632,000. Annualized, Sandusky paid approximately $5,322 per retiree. This is under the $5,800 national average for employees working in the rolled goods industry, as testified to by Siemer. Ogden also testified at length regarding an actuarial valuation prepared in accordance with Financial Accounting Standards[3] to determine Sandusky's accumulated post-retirement benefit obligation (APBO) as of October 1, 2004, and October 1, 2005, and for which he provided the underlying cost data. *See* Ex. 10. According to the actuarial valuation, the present value of projected costs of retiree health care benefits as of October 1, 2005, for the existing population of individuals receiving such benefits is $5,375,182, which includes $1,387,987 attributed to Chrysler Retirees.[4] *Id.* at attached Ex. A1. These values are based upon the current market trend of an

---

[2] At the request of SAI, an actuarial valuation was prepared by J. Richard Hogue, an actuarial consultant, to determine Sandusky's accumulated post-retirement benefit obligation (APBO) as of October 1, 2004, and October, 1, 2005. In preparing the report, Hogue relied on information provided by SAI regarding, among other things, the provisions of the healthcare and life insurance plan provisions. *See* Ex. 10, p. 1. The Summary of Plan Provisions included in the assumptions upon which the actuarial valuation is based includes a provision that termination of benefits occurs, with respect to the retiree, on the death of the retiree, and with respect to a spouse, on the death of the spouse. Ex. 10, attached Ex. E, p. 2. Similarly, in their reply in support of the instant motion, Debtors state that the "CBAs require that Sandusky provide the Retiree Benefits for the life of the Retirees." [Doc. # 260, p. 2].

[3] Financial Accounting Standard 106 requires companies to annually project the cost of, among other things, projected retiree benefit liabilities.

[4] These values represent a total decrease of $387,019 as compared to projections as of one year earlier. *See* Ex. 10, attached Ex. A1.

3

annual 1.5% increase in health care costs. In addition, the actuarial valuation indicates that, as of October 1, 2005, the present value of the projected cost of life insurance premiums for the existing population of retirees under Sandusky's fully insured life insurance plan is $321,088.[5] *Id.* at attached Ex. A2.

During the course of negotiations with the Union regarding termination of the CBA, Sandusky also made several proposals regarding Retiree health benefits. At the hearing on the instant motion, counsel for the Union stated that the Union accepted responsibility to represent the Retirees in this matter. On December 4, 2006, Sandusky proposed that it would terminate all retiree health benefits as of the plant closing date, but that it would honor claims for covered health services incurred on or before that date, to the extent assets are available, if submitted for payment by February 28, 2007. At least four additional offers were submitted to the Union during December 2006. Each contained proposals regarding both employees and Retirees. While proposals relating to employees were modified in each offer, the offers each contained the same proposal with respect to Retiree health benefits and each was rejected by the Union on behalf of Retirees. On January 4, 2007, Sandusky offered to extend the date of termination of Retiree health benefits to January 8, 2007. It also offered to assign, subject to written approval of Chrysler, any right it may have to receive payments from Chrysler for medical benefits for former Chrysler Retirees to a UAW-affiliated medical plan, provided that the trustees of the UAW medical plan accept the assignment and agree to provide coverage to the former Chrysler Retirees. While the Union engaged in active negotiations with respect to employees rights under the CBA, it rejected all proposals relating to the Retirees, and the parties agreed that the court would decide the motion as it relates to retiree benefits.

At the hearing, the parties also stipulated to the following facts:

1. Sandusky made proposals, and the Union made counter proposals, with respect to treatment of retiree benefits;

2. The proposals made were based on the most complete and reliable information available to the parties at the time of the proposals;

3. Sandusky has provided the Union information necessary to evaluate the proposals;

4. The parties met at reasonable times to reach agreement and did reach agreement on everything but the Retiree benefits;

5. Sandusky conferred with the Union in an attempt to reach a mutually satisfactory modification of the CBA and the retiree benefits.

---

[5] This figure represents a total increase in projected premium of $18,857 as compared to projections as of one year earlier. *Id.*

4

## LAW AND ANALYSIS

The Retiree Benefits Protection Act of 1988 amended the Bankruptcy Code by adding §§ 1114 and 1129(a)(13). Section 1129(a)(13) requires that as a condition to confirmation, the plan provide for the continuation of retiree benefits at the level established under § 1114 for the duration the debtor has obligated itself to provide such benefits. Section 1114 governs the modification or termination of retiree health benefits in a Chapter 11 case and provides in relevant part as follows:

> (f) (1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the trustee shall--
>
> (A) make a proposal to the authorized representative of the retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
>
> (B) provide, subject to subsection (k)(3), the representative of the retirees with such relevant information as is necessary to evaluate the proposal.
>
> (2) During the period beginning on the date of the making of a proposal provided for in paragraph (1), and ending on the date of the hearing provided for in subsection (k)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.
>
> (g) The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that--
>
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);
>
> (2) the authorized representative of the retirees has refused to accept such proposal without good cause; and
>
> (3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities. . . .

11 U.S.C. § 1114(f) and (g). A debtor may not modify and must timely pay retiree benefits unless the court orders modification after notice and a hearing in accordance with the procedural and substantive provisions set forth above, or unless the retirees' authorized representative agrees to modification of benefits.[6] 11

---

[6] Section 1114(h) also enables a debtor to obtain interim relief before a final order under § 1114(g). Different procedural and substantive standards apply when seeking interim relief. *See* 11 U.S.C. § 1114(h)(1) (requiring a debtor to show either that modification is "essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate"). Such

U.S.C. § 1114(e)(1). In addition, § 1114(e)(2) provides that any payment for retiree benefits required to be made before a plan confirmed under § 1129 is effective has the status of an allowed administrative expense as provided in § 503.

**I. Is § 1114 Applicable in a Liquidating Chapter 11?**

As a threshold matter, the court must determine the applicability of § 1114 in this case. The Union contends that § 1114 is not applicable in a liquidating Chapter 11 case. According to the Union, Congress intended § 1114 to be applicable only in a Chapter 11 reorganization where the debtor plans to emerge from bankruptcy as a viable entity. The Union argues that a debtor cannot establish that a proposed modification to retiree benefits is "necessary to permit reorganization," as is required under § 1114(g)(3), when the debtor is simply liquidating. While § 1114 may not have been written with a liquidating Chapter 11 plan in mind, *see In re Ionosphere Clubs, Inc.*, 134 B.R. 515, 521-22 (Bankr. S.D.N.Y. 1991) (explaining that § 1114 was enacted to address the issue of steel manufacturing LTV Corporation's obligation to continue paying retiree benefits during the pendency of its reorganization), as one court noted, "[t]he obvious congressional inattentiveness to liquidating Chapter 11 cases does not make § 1114 inapplicable to such cases," *In re Garfinckels, Inc.*, 124 B.R. 3, 4 (Bankr. D.C. 1991). Indeed, § 1114 was placed in a Chapter entitled "Reorganization" and that contemplates implementing a Chapter 11 plan through various means, including through the "transfer of all or any part of the property of the estate to one or more entities" or the "sale of all or any part of the property of the estate." 11 U.S.C. § 1123(a)(5)(B) and (D); *see In re Ionosphere*, 134 B.R. at 524 (stating "absent corrective or clarifying legislation, the statute's placement in Chapter 11 requires its application to liquidating Chapter 11 cases"); *United Food & Comm'l Workers Union, Local 211 v. Family Snacks, Inc. (In re Family Snacks, Inc.)*, 257 B.R. 884, 895 (B.A.P. 8th Cir. 2001) (stating that "reorganization" is generally understood to include "all types of debt adjustment, including a sale of assets, piecemeal or on a going concern basis"). Section 1114 itself does not distinguish between a liquidating plan and one in which the debtor seeks to rehabilitate its business – the plain language of the statute requires *any* debtor-in-possession or trustee to comply with its provisions before being entitled to modify or terminate retiree benefits. *See* 11 U.S.C. § 1114(e)(1)(A); *Cf. United Steelworkers of America, AFL-CIO, CLC v. Ohio Corrugating Co.*, 1991 WL 213850 (N.D. Ohio 1991) (finding similar provisions governing the rejection of a collective bargaining agreement found in § 1113(f) apply in a liquidating Chapter 11); *In re Horizon Natural Res. Co.*, 316 B.R. 268 (Bankr. E.D. Ky. 2004) (applying both § 1113 and § 1114 in a Chapter 11 liquidation); *In re U.S. Truck Co. Holdings*, 2000 Bankr. LEXIS 1376, *24

---

relief is not at issue in this case.

(Bankr. E.D. Mich. 2000) ("Section 1113 contains no words of limitation or exclusion, and fails to distinguish between liquidating Chapter 11 cases and Chapter 11 cases where the debtor seeks to rehabilitate a failing business"). The court is not persuaded by *In re Cedar Rapids Meats, Inc.,* 117 B.R. 448 (Bankr. N.D. Iowa 1990), the only case cited by the Union in support of its argument that § 1114 does not apply in a Chapter 11 liquidation. In *Cedar Rapids*, the debtor sought interim relief from certain provisions of a collective bargaining agreement under § 1114(h). Different procedural and substantive standards apply when interim relief is sought. *See* 11 U.S.C. § 1114(h)(1) (requiring a debtor to show either that modification is "essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate"). The court noted that the debtor had suspended its operations and did not contend that interim relief was essential to the continuation of its business. The issue addressed by the court was whether the relief was warranted in order to avoid irreparable damage to the estate. The court concluded that the accrual of potential priority claims in favor of retirees does not constitute irreparable damage under § 1114(h). *Cedar Rapids* does not, however, stand for the proposition that § 1114 is inapplicable in a Chapter 11 liquidation.

## II. Application of § 1114

The following nine-part test enunciated in *In re American Provision Co.*, 44 B.R. 907 (Bankr. D. Minn. 1984), that courts often use in considering the requirements necessary for rejection of a collective bargaining agreement has also been applied in considering the requirements for modification of retiree benefits under § 1114(f) and (g). *In re Horizon Natural Res. Co.*, 316 B.R. at 281 (noting that the requirements for modification of retiree benefits are substantially the same as those for rejection of collective bargaining agreements).

> 1. The debtor must make a proposal to the union to modify the collective bargaining agreement.
> 2. The proposal must be based on the most complete and reliable information available at the time of the proposal.
> 3. The proposed modifications must be necessary to permit the reorganization of the debtor.
> 4. The proposed modifications must assure that all creditors, the debtor and all the affected parties are treated fairly and equitably.
> 5. The debtor must provide the union such relevant information as is necessary to evaluate the proposal.
> 6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the union.
> 7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.
> 8. The union must have refused to accept the proposal without good cause.
> 9. The balance of the equities must clearly favor rejection of the collective bargaining

7

agreement.

*American Provision Co.*, 44 B.R. at 909. Debtor has the burden of proving each factor by a preponderance of the evidence. *Id.*

Debtor and the Union have stipulated that Debtor has satisfied factors one, two, five, six and seven. While Debtor contends that the Union has refused to accept its proposal without good cause, it is the Union's position that Debtor has not shown that the proposed termination of retiree benefits is necessary to permit its reorganization, that the termination assures that all creditors, the debtor and affected parties are treated fairly and equitably, or that the balance of equities clearly favor termination of Retiree benefits. Because Debtor's failure to meet its burden as to any of the requirements under § 1114(f) and (g) must result in denial of its motion to terminate Retiree benefits, and because the court agrees that Debtor has not shown that termination of retiree benefits is necessary to permit its reorganization, this opinion addresses only that factor.

Courts have addressed the meaning of § 1114(g)'s requirement that a proposed modification or termination of retiree benefits be "necessary to permit the reorganization of the debtor" and have concluded that the requirement must be interpreted to mean "necessary to accommodate confirmation of a Chapter 11 plan" when applied in a liquidating Chapter 11 case. *In re Ionosphere*, 134 B.R. at 525; *In re Family Snacks, Inc.*, 257 B.R. at 896; *cf. In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 371 n.14 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) (explaining that because a plan of reorganization under Chapter 11 can consist of a liquidation of the debtor, a debtor could satisfy the "necessary to an effective reorganization" test under § 362(d)(2) by showing that the property at issue "is necessary to an effective liquidation of the debtor under Chapter 11, as distinguished from an effective rehabilitation of the debtor").

In this case, Debtors' main impetus for seeking termination of the Retiree benefits is to eliminate significant administrative expenses. For a Chapter 11 plan to be confirmed, § 1129(a)(9)(A) requires that a debtor pay allowed administrative expenses in cash on the effective date of the plan unless the holder of the claim has agreed to a different treatment of such claim. Retiree benefits required to be made before a confirmed Chapter 11 plan becomes effective are administrative expenses. 11 U.S.C. § 1114(e)(2). Debtors offered evidence that Sandusky paid approximately $5,322 annually per retiree for health benefits, for a total of $505,600 per year, an amount that includes benefits paid for the 42 Chrysler Retirees for which it receives reimbursement from Chrysler. To the extent that similar payments can be anticipated to be paid before the effective date of a confirmed plan, Debtors contend that it will be unable to confirm a plan unless the Retiree benefits are terminated. In any event, Debtors argue that they are under a duty to limit ongoing

8

administrative expenses.

In addition, § 1129(a)(13) requires a Chapter 11 debtor to continue retiree benefits after the effective date of a Chapter 11 plan at the levels established under § 1114. In a liquidating Chapter 11, this requires Sandusky to provide the Retirees with the present value of the future benefits to which they are entitled. Debtors presented evidence that the present value of the projected cost of life insurance premiums for the Retirees is $321,088 and that the present value of projected costs of Retiree health care benefits as of October 1, 2005, for the existing population of individuals receiving such benefits is $5,375,182, which includes the Chrysler Retiree benefits of $1,387,987. There is, of course, the possibility that health benefits to which Chrysler Retirees are entitled may be handled differently, that is, it may be possible to assign any right Sandusky has to receive payments from Chrysler for Chrysler Retiree benefits to a UAW-affiliated medical plan. That would then allow continued coverage to the Chrysler Retirees without the attendant cost to Sandusky. This avenue apparently has not yet been thoroughly explored and the parties are unsure whether or not such an assignment would be approved by both Chrysler and a UAW-affiliated medical plan.[7] To the extent it would not be approved, Sandusky will be facing a liability under § 1129(a)(13) of approximately $5.7 million. Debtors argue that it will be unable to meet this obligation and, therefore, unable to propose a confirmable plan unless the Retiree benefits are terminated.

While Debtors have presented evidence of the cost of Retiree benefits, Sandusky has not yet proposed a liquidation plan. It is difficult, although perhaps not impossible, to determine whether or not the termination of Retiree benefits is necessary to accommodate confirmation of a Chapter 11 plan when no plan has been proposed. Debtors are attempting to sell Athol as a going concern and have indicated that some of Sandusky's assets will be sold in conjunction with the sale of Athol. In addition, Debtors have proposed a sale at auction of other assets of Sandusky. But there is no evidence of the range of value that Debtors anticipate receiving for either Athol or Sandusky's assets. There is also no evidence or testimony regarding how the Athol sale will affect any class of creditors of Sandusky or how it will affect the liquidation of assets that are the property of Sandusky's bankruptcy estate. Information regarding the projected liquidation value of assets of Sandusky's bankruptcy estate is essential to the court's determination as to whether termination of the Retiree benefits is necessary to accommodate confirmation of a Chapter 11 plan. To the extent that the sale of Sandusky's assets will yield sufficient funds to satisfy any administrative expense under § 1114(e)(2) and its obligations under § 1129(a)(9)(A) and (a)(13), it is not

---

[7] According to the parties, any assignment of Sandusky's right to receive payments from Chrysler requires the written approval of Chrysler.

9

necessary to terminate Retiree benefits. The only evidence before the court of the value of Sandusky's assets, which, because the Debtors' cases are not substantively consolidated, are the only assets relevant to the court's determination, are the values set forth in Sandusky's bankruptcy schedules. Those schedules show that Sandusky's assets exceed its scheduled liabilities by nearly $14 million. While the court does not suggest that a liquidation sale of Sandusky's assets will yield proceeds in the amount of values set forth in its bankruptcy schedules, on the evidence before it, the court cannot conclude that Sandusky will be unable to propose a plan that complies with the requirements of § 1129(a)(9)(A) and (a)(13) unless the Retiree benefits are terminated.

Debtors also argue that they have a duty to limit administrative expenses and, thus, are entitled to seek termination of the Retiree benefits. However, § 1114 provides the sole basis for termination of such benefits, and the priorities assigned to Retiree benefits are a matter of legislative enactment that may not be altered except as set forth in that section. *See Cedar Rapids Meats, Inc.*, 117 B.R. at 450 (finding that "the priorities assigned to . . . the retirees . . . are a matter of legislative enactment, not of 'inequitable distribution' to creditors of the estate").

Finally, Debtors argue that Sandusky will be unable to satisfy the best interests of creditors test under § 1129(a)(7) unless Retiree benefits are terminated. Under the best interests of creditors test, a plan may not be confirmed unless all impaired creditors either accept the plan or "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A). As one commentator explains, "[t]his means that, absent consent, a creditor . . . must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution if the debtor were liquidated instead of reorganized *on the plan's effective date.*" 7 Alan N. Resnick, et al., *Collier on Bankruptcy* ¶ 1129.03[7][b] (15th ed. 2004) (emphasis added). This provision provides an individual guaranty to each creditor or interest holder that it will receive, as of the effective date of the plan, at least as much in reorganization as it would in liquidation. *Id.* at ¶ 1129.03[7].

First, by its express terms, § 1129(a)(7) applies only to holders of impaired claims or interests. As discussed above, Debtors have not yet proposed a Chapter 11 plan and have provided no evidence of the liquidation value of Sandusky's assets and, thus, no evidence from which the court may conclude that any claim will be impaired. Nevertheless, in arguing that Sandusky will be unable to satisfy the best interests of creditors test unless Retiree benefits are terminated, Debtors rely on the following reasoning set forth by the court in *Ionosphere Clubs*:

10

> Since, under Chapter 7, the retiree's claim for unaccrued benefits would be a prepetition general unsecured claim, all other creditors would necessarily receive a greater distribution under Chapter 7. Therefore, absent a modification of the benefits which is either accepted by Eastern's creditors or reduces the cost of the benefits to the point at which the value of confirming a Chapter 11 plan exceeds the cost of the modified benefits, the Trustee would not be able to propose a confirmable plan of liquidation. In other words, without modification or termination of the benefits, the retirees will receive a maximum recovery in Chapter 11 while the other unsecured creditors will receive their maximum recovery in Chapter 7.

*In re Ionosphere Clubs, Inc.*, 134 B.R. at 525-26. This reasoning, however, ignores the date on which the best interests of creditors is determined. Under § 1129(a)(7)A)(ii), the court must determine the amount an impaired creditor would receive if liquidated in a Chapter 7 case on the effective date of the plan. In order to make this determination, the court must consider two factors – the amount of the creditors' claims and the liquidation value of assets of the estate. Both of these factors are considered as of the plan's effective date. Again, having no evidence of Sandusky's projected liquidation value, the court cannot make the determination necessary under the best interests of creditors test.

To the extent *Ionoshpere Clubs* stands for the proposition that, regardless of the actual liquidation value, unsecured creditors will always receive less than they would if the estate were liquidated under Chapter 7 since § 1114(e)(2), which applies only in a Chapter 11 case, provides retirees with an administrative claim for benefits payable before the plan's effective date while Chapter 7 provides them with only a general unsecured claim, the court disagrees. Again, the date on which the court determines the best interests of creditors is the effective date of the plan. If the retiree benefits have not been terminated, they have an administrative claim for benefits payable before that date. If on that date the debtor is then liquidated under Chapter 7, existing Chapter 11 administrative claims do not disappear. They remain administrative claims; however, they are subordinated to any Chapter 7 administrative claims that accrue. *See* 11 U.S.C. § 726(b). Thus, the claims of retirees, along with claims of other holders of administrative claims that are unique to Chapter 11, such as, for example, counsel for an unsecured creditors' committee, will still have priority over general unsecured creditors. To interpret the best interests of creditors test in any other manner would nullify the provisions of § 1114(e)(2) in all cases except those that provide 100% distribution to unsecured creditors. That is a result that is not required by the plain language of § 1129(a)(7)(A) nor, does the court believe, a result intended by Congress. Having failed to show that termination of Retiree benefits is necessary to accommodate confirmation of a Chapter 11 plan, Debtors' motion will be denied.

**THEREFORE,** for the foregoing reasons, good cause appearing,

11

**IT IS ORDERED** that Debtors' motion for order authorizing termination of retiree benefits [Doc. # 145] be, and hereby is, **DENIED**, without prejudice.