**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: August 3 2012**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 06-33227 |
| | ) | (Jointly Administered) |
| SAI Holdings Limited, et al., | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

**MEMORANDUM OF DECISION REGARDING TONCEE'S MOTION TO COMPEL BANK OF AMERICA TO DISGORGE PROCEEDS AND ORDER SETTING FURTHER STATUS CONFERENCE**

This case is before the court on the Motion of Toncee, Inc. for an Order Compelling Bank of America to Disgorge Proceeds it has Received Post Confirmation from the Creditor Trust and for Accounting ("Motion") [Doc. # 1505], and responses filed by SAI Administrative Claim and Creditor Trust ("SAI Trust") [Doc. # 1508] and Bank of America, N.A. ("the Bank") [Doc. # 1510]. The court held a hearing on the Motion, at which the parties agreed that a threshold issue to the determination of the Motion is the proper interpretation of the confirmed First Amended Plan of Orderly Liquidation ("Plan") [Doc. # 984] and the Supplement to Final Order Pursuant to Section 364(c)(1), (c)(2) and (d)(1) of the Bankruptcy Code and Bankruptcy Rule 4001(c) Authorizing Postpetition Financing ("Supplemental Order") [Doc. # 1016], and specifically, whether these documents authorized certain of the Bank's advances of funds to Debtors and/or the SAI Trust and, if not, whether such authorization was required. The parties agreed that

the court should decide the threshold issues before they engage in discovery that would otherwise be needed. The court granted leave to file, and the parties have filed, additional briefs on those issues. [*See* Doc. ## 1531, 1537, 1538, 1540].

## **BACKGROUND**

On November 8, 2006, Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The court ordered the Chapter 11 cases to be jointly administered. At the time of filing, Debtors were obligated to the Bank for certain prepetition loans that were secured by liens on substantially all of Debtors' assets, other than real property located in Sandusky, Ohio.

On February 15, 2007, the court entered a final order authorizing postpetition financing ("Final Financing Order" or "Final Order"). [Doc. # 396]. The Final Order authorized Debtors to use cash collateral and obtain postpetition financing from the Bank "upon the terms and conditions set forth in this Final Order in compliance with and for the purposes of funding those expenses set forth in the [submitted budget]," which the order states "may be amended further from time to time with the consent of all parties who are signatories to this Final Order, and such amended Budget shall be filed with this Court and served on the interested parties and their counsel of record." [*Id.* at ¶ 1]. The Final Order authorized Debtors to execute a postpetition credit agreement ("Credit Agreement"), a line of credit note, and a term note, as well as other loan or security documents to be executed in connection therewith, together referred to as Loan Documents. [*Id.* at ¶ 2]. The court expressly authorized Debtors to borrow from the Bank a total of $20,400,000 and to comply with and perform all of the terms and conditions of the Loan Documents, subject to the terms and conditions of the Final Financing Order. [*Id.* at ¶¶ 2-3]. The maturity date for the line of credit was May 8, 2007. [*See id.* at ¶ 2(A)]. Under the terms of the Final Order, as security for Debtors' "Obligations," defined as "[a]ll loans made under the Credit Agreement and . . . obligations and liabilities of the Debtors to Bank of America under the Loan Documents," [*id.* at ¶ 2], the Bank was granted a lien on substantially all of Debtors' prepetition and postpetition property, [*see id.* at ¶ 5]. In addition, the Final Order provides that the Obligations under the Credit Agreement constitute "Superpriority Claims" with "priority in payment over any and all administrative expenses. . . ." [*Id.* at ¶ 4].

After entry of the Final Order, Lear Corporation, Debtors' largest customer, gave the Bank notice of its intent to resource all production from Debtor Athol Manufacturing Corporation's facility in Butner, North Carolina. This constituted a "Termination Event" under the Final Order. [*Id.* at ¶ 9(g)]. The Final Order states that after providing notice of a Termination Event, "Bank of America may exercise rights and

remedies and take all or any of the following actions without . . . further order of or application to this Court (i) terminate the postpetition financing arrangements . . . (iv) take any other action or exercise any other right or remedy permitted to Bank of America under the Loan Documents, the Interim Orders, this Final Order or by operation of law." [*Id.* at ¶ 9]. The Final Order further provides that "[n]otwithstanding the foregoing, upon Bank of America's written notice and filing of an affidavit with this Court evidencing the occurrence of a Termination Event, the Debtor's right to make draws under the Line of Credit shall automatically terminate." [*Id.*].

The Bank provided and filed the notice of the Termination Event contemplated by the Final Order, stating, among other things, that "Debtors' ability to make draws on the line of Credit will terminate as of March 7, 2007, pursuant to the terms of the Final DIP Order." [Doc. # 457, Gore Aff., ¶ 6 and attached Ex. B]. Notwithstanding the Termination Event and the notice of such filed by the Bank, the Bank continued to advance funds to Debtors.

On August 1, 2007, the Bank, Debtors, the Unsecured Creditors Committee and Eastar, Inc. (another secured creditor of Debtors) filed a joint motion ("Joint Motion") to approve a proposed supplement to the Final Financing Order ("Proposed Supplemental Order"). [Doc. # 903]. The Proposed Supplemental Order was attached as an exhibit to the Joint Motion. [*Id.*, Ex. B]. The Proposed Supplemental Order sets forth certain facts that include the following: "Bank of America, the Debtors and the Committee have requested that this Court approve any and all advances made by Bank of America to the Debtors to date, including but not limited to all advances made to or for the benefit of Debtors following the Termination Event." [*Id.* at ¶ K]. Pursuant to the Proposed Supplemental Order, Debtors also sought authorization to execute Amendment No. 1 Post-Petition Credit Agreement (the "First Amendment"), which extended the maturity of the Line of Credit and Term Loan to August 31, 2007. [*See id.* at ¶ J and ¶ 3].

Toncee, Inc. ("Toncee"), movant herein, was served with the Joint Motion. [*See* Doc. # 920]. It did not, however, file an objection, although it was represented by counsel at both hearings on the Joint Motion that were held by the court, [*see* Doc. ## 978 & 1000]. On September 13, 2007, the court entered an order ("Supplemental Order") that was a modified version of the Proposed Supplemental Order. [Doc. # 1016]. Toncee did not appeal or seek to vacate that order.

The Supplemental Order authorized Debtors

> to continue to use Cash Collateral and obtain postpetition financing from Bank of America upon the terms and conditions set forth in this Supplement and the Final Order in compliance with and for the purposes of funding those expenses set forth in the Supplemental Budget

> for the time period from September 1, 2007 through November 2, 2007, a copy of which is attached hereto as Exhibit A (the "Supplemental Budget"). The Supplemental Budget may be amended further from time to time with the consent of all parties who are signatories to this Supplement, and such further Supplemental Budget shall be filed with this Court and served on the interested parties and their counsel of record. The Supplemental Budget supplements the Budget that was attached to the Final Order.

[*Id.* at ¶ 2]. The Supplemental Order acknowledged Debtors' execution of the First Amendment and authorized their execution of a second amendment to the Credit Agreement ("Second Amendment") extending the maturity of the Line of Credit and Term Loan to November 2, 2007. [*Id.* at ¶ 8]. The Supplemental Order also expressly authorized Debtors

> to comply with and perform all of the terms and conditions of the Loan Documents, as amended by the First Amendment and the Second Amendment, including the repayment of amounts borrowed thereunder, with interest, in accordance with and subject to the terms and conditions set forth in the Loan Documents, as amended by the First Amendment, the Second Amendment, the Final Order and this Supplement.

[*Id.*]. In addition to the Liens granted pursuant to the Final Order, the Supplemental Order granted the Bank a lien upon certain avoidance actions and provided that such liens "shall be limited to the amount of professional fees and expenses that are funded by Bank of America by advances under the Line of Credit or paid by the Debtors by the use of Cash Collateral during the period from March 7, 2007 through November 2, 2007." [*Id.* at ¶ 4].

Finally, the Supplemental Order includes the following provision that was included in the Proposed Supplemental Order:

> Subject to the issues reserved in paragraph 13, Bank of America . . . [is] hereby released from any and all claims, rights, causes of action of, or defenses by, and all liabilities owing to . . . all of the Debtors' creditors or other parties in interest arising out of or based on any facts or circumstances occurring from the entry of the Final Order until the entry of this Supplement. This paragraph is not intended to nor shall it affect any rights, remedies, claims or defenses of Toncee, Inc. as asserted in the Motions and Amended Motions [for allowance and payment of administrative claim] . . . .

[*Id.* at ¶ 11]. Paragraph 13 refers to reservation of rights relating to Lear Corporation.[1] Toncee's motions and amended motions for allowance and payment of administrative claim referred to in paragraph 11 did not raise any issue now before the court, [Doc. ## 535, 583, 803, & 805], and were resolved by agreed order on April 9, 2008, [Doc. # 1294]. Pursuant to the agreed order, Toncee's administrative claims were allowed

---

[1] Lear Corporation was the only party that filed an objection to the Joint Motion. [*See* Doc. # 926].

in full and Toncee withdrew its objection to confirmation of Debtors' Chapter 11 plan. [*Id.*].

On November 8, 2007, the court entered an Order Confirming First Amended Plan of Orderly Liquidation and Distribution ("Confirmation Order"). [Doc. # 1146]. In the Confirmation Order, the court ordered that both the Final Financing Order and the Supplemental Order shall survive entry of the Confirmation Order and, if the terms of the Final Financing Order or the Supplemental Order conflict in any manner with the Plan or Confirmation Order, the Final Financing Order and the Supplemental Order shall govern. [*Id.* at ¶ 3(a) and (b)]. The Confirmation Order further provides:

> [f]or clarity, notwithstanding anything in the Plan or this Confirmation Order to the contrary, no funds will be paid from the Liquidating Trust to pay the expenses of liquidation of assets or any other expenses following confirmation, unless a budget for such amounts is approved by Lear in accordance with the terms of the Financing Order and Supplement.

[*Id.* at ¶ 3(c)].

Under the terms of the Plan, Debtors' remaining assets are to be liquidated by the Liquidating Agent[2] and, after payment of any Allowed Secured Claims (as defined in the Plan) with respect to the assets being sold, any remaining proceeds from sales are to be delivered to the SAI Trust and the Liquidating Agent for distribution in accordance with the Plan. [Doc. # 984, ¶ 4.1]. The Plan provides that "[t]he SAI Trust shall be formed to provide the means and mechanism for the effective collection and liquidation of the remaining assets of Debtors. . . ." [*Id.* at ¶ 4.2.1]. The Plan provides that on the effective date of the Plan, title to property of the Debtors vests in the SAI Trust and "Debtors are discharged from its status as Debtors and the affairs and business of the Liquidating Debtors and the SAI Trust thereafter shall be conducted without Bankruptcy Court involvement except as expressly set forth and governed by the Plan." [*Id.* at ¶ 8.1].

Under the terms of the Plan, the Liquidating Agent is vested with the rights, duties and obligations to

> (a) manage the liquidation of any remaining assets of the Debtors under the SAI Trust; (b) have authority, on behalf of the estates, the Liquidating Debtors and the SAI Trust, to execute any documents on behalf of the Liquidating Debtors; . . . and (h) perform such other duties as set forth in the SAI Trust."

[*Id.* at ¶ 4.2.3]. The Plan further provides that the Liquidating Agent is authorized to execute "on behalf of the Debtors or the SAI Trust such contracts, instruments . . . and other agreements or documents, and take

---

[2] On April 25, 2007, the court had granted Debtors' application to retain and employ O'Keefe & Associates Consulting, LLC, to serve as Chief Liquidation Officer to the Debtors to supervise, direct and control the orderly liquidation of Debtors' assets. [Doc. # 597].

such actions a may be necessary or appropriate to effectuate . . . the terms and conditions of the Plan." [*Id.* at ¶ 4.5]. Finally, the Plan provides that "[a]ll fees and expenses of the Debtors, the Liquidating Debtors or the SAI Trust and the Committee arising after the Confirmation Date shall be billed directly to and paid by the Liquidating Agent on behalf of the Liquidating Debtors and/or the SAI Trust in the ordinary course of business." [*Id.* at ¶ 4.3].

The SAI Trust document was executed on December 26, 2007. It empowers the Liquidating Agent, subject to the provisions and limitations of the trust, "to take any and all actions as, in its sole judgment and discretion, are necessary or advisable to effectuate the purposes of the SAI Trust. . . ." [Doc. # 1550, SAI Trust, ¶ 6.3]. The SAI Trust document provides that the laws of Michigan shall govern the interpretation and validity of its provisions and "all questions relating to management, administration and investment of the SAI Trust and the Trust Property." [*Id.* at ¶ 8.5].

It is undisputed that the Liquidating Agent, on behalf of the Liquidating Debtors and the SAI Trust, has executed amendments to the Credit Agreement since the court's November 8, 2007, Confirmation Order. [*See, e.g.* Doc. # 1531, Ex. E]. It is also undisputed that, since confirmation of the Plan, the Liquidating Debtors and the SAI Trust have borrowed funds from the Bank under the terms of the line of credit in the Credit Agreement, as subsequently amended, and have done so without filing an amended Supplemental Budget.

## **DISCUSSION**

Toncee argues that certain of the Bank's advances to Debtors and the SAI Trust were unauthorized and, as such, were done on an unsecured, non-priority basis. Specifically, Toncee contends that the following were unauthorized advances made by the Bank: (1) advances made between March 7, 2007, the date of the Termination Event under the Final Financing Order, and September 13, 2007, the date of the Supplemental Order, and (2) advances made after November 2, 2007, the last day for which a Supplemental Budget had been submitted under the Supplemental Order.[3] The court addresses the challenged categories of advances below.

## **I. Advances Between March 7, 2007, and September 1, 2007**

According to Toncee, Debtors' ability to borrow funds from the Bank under the Credit Agreement terminated on March 7, 2007, and the Supplemental Order legally could not, and by its terms did not,

---

[3] Toncee's argument is that advances made after November 1, 2007, were unauthorized. However, the Supplemental Order clearly authorized advances for the purpose of funding those expenses set forth in the Supplemental Budget for the time period from September 1, 2007, through November 2, 2007. [*See* Doc. # 1531, ¶ 2].

6

retroactively authorize loans obtained from the Bank from this date until the court entered the Supplemental Order on September 13, 2007. For the reasons discussed below, the court disagrees that the Supplemental Order did not retroactively authorize the challenged loans and finds that Toncee is prohibited from now challenging the legal basis of that Order.

### A. Authorization Under the Supplemental Order

In presenting its argument, Toncee focuses on paragraph two and the first two sentences in paragraph 8 of the Supplemental Order. Paragraph two authorizes future financing from the Bank in order to pay budgeted expenses for the time period from September 1, 2007, through November 2, 2007. And the first two sentences of paragraph 8 acknowledge Debtors' execution of the First Amendment to the Credit Agreement and authorize Debtors to execute a Second Amendment. While these provisions alone do not retroactively authorize loans made under the First Amendment, Toncee ignores the third sentence in paragraph 8, authorizing Debtors

> to comply with and perform all of the terms and conditions of the Loan Documents, *as amended by the First Amendment* and the Second Amendment, including the repayment of amounts borrowed thereunder, with interest, in accordance with and subject to the terms and conditions set forth in the Loan Documents, *as amended by the First Amendment*, the Second Amendment, the Final Order and this Supplement.

[Doc. # 1531, ¶ 8 (emphasis added)]. By authorizing Debtors to comply with the terms and conditions of the Loan Documents, as amended by the First Amendment, the court implicitly, if not expressly, authorized the loans made pursuant to the First Amendment. That such loans were authorized by the Supplemental Order is further demonstrated by the fact that the additional liens granted the Bank in paragraph four were limited to the amount of professional fees and expenses funded by the Bank or paid by the Debtors during the period from March 7, 2007, through November 2, 2007. It was not limited to the more restricted time period referred to in paragraph two with respect to future financing.

### B. Res Judicata

Both the Bank and the SAI Trust argue that res judicata principles bar Toncee's challenge to the legal basis of the Supplemental Order. The court agrees.

Under the doctrine of res judicata, a party is precluded from bringing a claim if each of the following elements are present:

> (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies[';] (3) an issue in the subsequent action which was litigated or should have been litigated in the prior action; and (4) an identity of the causes

of action.

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 577-78 (6th Cir. 2008) (quoting *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002)).

In this case, the Supplemental Order, from which no appeal was taken, constitutes a final decision on the merits of the Joint Motion. As a creditor in this bankruptcy case, Toncee was served with and was a party to the Joint Motion. *See Sanders Confectionery Prod., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 481 (6th Cir. 1992) (stating with respect to bankruptcy orders that creditors must be considered parties for res judicata purposes). Toncee, in fact, was represented by counsel at both hearings held by the court on the Joint Motion and offered no objection to the motion. Thus, the first and second elements under *Winget* are satisfied.

The third element is also satisfied. The Joint Motion asked the court to approve a Proposed Supplemental Order, which stated that "Debtors and the Committee have requested that this Court approve any and all advances made by Bank of America to the Debtors to date, *including but not limited to all advances made to or for the benefit of Debtors following the Termination Event*" and sought authorization for Debtors to execute the First Amendment. [Doc. # 903, Ex. B, ¶¶ K, J, and ¶ 3]. The Proposed Supplemental Order included language authorizing Debtors "to comply with and perform all of the terms and conditions of the Loan Documents *as amended by the [First] Amendment . . .* in accordance with *and subject to the terms and conditions set forth*" not only in the Loan Documents, but also the Final Order and the Supplemental Order, [*id.* at ¶ 3], which in turn granted liens to secure, and superpriority claims with respect to, Debtors' "Obligations" under the Loan Documents. Thus, Debtors sought retroactive approval of the post-Termination Event financing that Toncee now challenges. The court finds no merit in Toncee's argument that it received no notice that Debtors were seeking such relief. To the extent that a legal basis for the relief sought by Debtors and granted by the court is lacking, Toncee had the opportunity, and was required, to raise its objection in 2007 before entry of the Supplemental Order.

Finally, with respect to the fourth element, the Sixth Circuit has declined to adopt a test narrowly defining "identity of claims" when res judicata is asserted in conjunction with bankruptcy proceedings. *Winget*, 537 F.3d at 580. In *Winget*, the court explained that this element is satisfied if "'the claims arose out of the same transaction or series of transactions,' or if 'the claims arose out of the same core of operative facts.'" *Id.* (quoting *Browning v. Levy*, 283 F.3d 761, 773-74 (6th Cir. 2002)). In this case, Toncee's Motion challenges, at least in part, the same post-Termination Date financing that was the subject of Debtors' Joint

8

Motion and that was approved in the Supplemental Order. Thus, the fourth element under *Winget* is satisfied. Accordingly, Toncee's challenge to the legal basis of the Supplemental Order is barred by the doctrine of res judicata.

### C. Supplemental Order's Release Provision

Toncee is also estopped from challenging advances made by the Bank between March 7, 2007, and September 1, 2007, pursuant to the release provision in paragraph 11 of the Supplemental Order. Paragraph 11 provides that the Bank is "released from any and all claims, rights, causes of action of, or defenses by, and all liabilities owing to . . . all of the Debtors' creditors . . . arising out of or based on any facts or circumstances occurring from the entry of the Final Order until the entry of this Supplement." [Doc. # 1016, ¶ 11]. The Final Order was entered on February 15, 2007. As discussed earlier, the exceptions to the broad release that are noted in paragraph 11 do not apply to issues raised by Toncee in its Motion. The release thus applies to Toncee's claim that the Bank's advances between March 7, 2007, and September 1, 2007, are unauthorized transactions.

## II. Advances After November 2, 2007

Toncee also argues that the advances made by the Bank after November 2, 2007, are neither secured nor entitled to superpriority claim status because these loans were not authorized by the Supplemental Order, the Plan, or the SAI Trust. According to Toncee, the Supplemental Order authorized continued financing only through November 2, 2007, and nothing in the Plan or SAI Trust expressly permits the Liquidating Agent to borrow money on behalf of Debtors or the Trust.

The court agrees that the Supplemental Order does not authorize continued financing after November 2, 2007. It expressly authorized Debtors to continue to obtain postpetition financing upon the terms set forth in the Supplemental Order and Final Financing Order only for the purpose of funding expenses set forth in the supplemental budget submitted for the time period from September 1, 2007, through November 2, 2007. While the Supplemental Order contemplates the possibility of an amended supplemental budget being filed, no such budget was actually filed with the court.

Furthermore, both the Final Financing Order and the Supplemental Order were entered pursuant to 11 U.S.C. § 364(c)(1), (2) and (d)(1), which, as the SAI Trust correctly argues, does not apply on a post-confirmation basis. By its express terms, § 364(c) and (d) refer only to the obtaining of credit by the bankruptcy trustee, or Debtors-in-Possession in this case, and refer to incurring debt secured by a lien on "property of the estate." After confirmation of the Plan, Debtors were no longer Debtors-in-Possession, but,

9

rather, became the "Liquidating Debtors," [*See* Doc. # 984, Plan, ¶¶ 1.1.46, 8.1]. *Int'l Asset Recovery Corp. v. Thomson McKinnon Sec. Inc.*, 335 B.R. 520, 525 (S.D.N.Y. 2005) (stating that the debtor was a debtor-in-possession only until confirmation of the Chapter 11 plan). And on the effective date of the Plan, no property remained in the estate to which a lien can attach. *See* [Doc. # 984, Plan, ¶ 8.1 (vesting title to property in the SAI Trust)]; *In re Les Ruggles & Sons, Inc.*, 222 B.R. 344, 345 (Bankr. D. Neb. 1998). To the extent that the Confirmation Order states that the Final Financing Order and Supplemental Order shall survive entry of the Confirmation Order, such survival refers only to the status of the advances authorized, and the continued validity of the security interests and liens granted, under those orders. *Cf.* Doc. # 1016, Supplemental Order, ¶ 12 (providing that the terms and provisions of the Supplemental Order and Final Order shall survive entry of any order which may be entered "confirming any plan of reorganization in any of the Chapter 11 Cases (and the Obligations shall not be discharged by the entry of any such order. . . .")).

While the court agrees that the Final Financing Order and Supplemental Order do not authorize financing after November 2, 2007, the court disagrees with Toncee's argument that the provisions of the Plan and the SAI Trust do not permit the Liquidating Agent power to borrow money on behalf of the Liquidating Debtors or the SAI Trust. Toncee is correct that neither the Plan nor the SAI Trust specifically address such power. Nevertheless, the Plan vests the Liquidating Agent with the "right, duties and obligations to (a) manage the liquidation of any remaining assets of the Debtors under the SAI Trust; (b) have authority, on behalf of the estates, the Liquidating Debtors, and the SAI Trust, to execute any documents on behalf of the Liquidating Debtors; . . . and (h) perform such other duties as set forth in the SAI Trust." [Doc. # 984, Plan, ¶ 4.2.3]. The Plan also states that the Liquidating Agent is authorized to "take such actions as may be necessary or appropriate to effectuate . . . the terms and conditions of the Plan." [*Id.* at ¶ 4.5]. The SAI Trust then grants the Liquidating Agent the power to "take any and all actions as, in its sole judgment and discretion, are necessary or advisable to effectuate the purposes of the SAI Trust. . . ." [Doc. # 1550, SAI Trust, ¶ 6.3]. Thus, to the extent that borrowing funds was necessary or advisable to effectuate the purposes of the SAI Trust, that is, to liquidate Debtors' remaining assets, the Plan and the SAI Trust provide the Liquidating Agent authority to do so "without Bankruptcy Court involvement." [Doc. # 984, Plan, ¶ 8.1].

The case *O'Brien v. Hirshfeld*, 285 Mich. 308 (1932), cited by Toncee does not require a different result. That case involved the Union Guardian Trust Company's reorganization and liquidation under Michigan law. The court was asked to determine whether a Michigan chancery court had power to

authorize the liquidating agent to borrow money for specific purposes. *Id.* at 314. The court noted that under the plan of reorganization, all of the assets of the trust company were in the control of the liquidating trustees and under the supervision and direction of the court. The court concluded that the chancery court had the power to authorize the requested borrowing, stating that "[t]he right to borrow money and to pledge the assets is not absolute; it must be determined by a court of equity in its administration of justice among those who have a pecuniary interest in the affairs of the bank." *Id.* at 315 (quoting *Blades v. Hood*, 203 N.C. 56 (1932), which was interpreting the banking laws of North Carolina).

The *O'Brien* case is materially distinguishable in that, unlike this case where the Plan specifically provides that the SAI Trust "shall be conducted without Bankruptcy Court involvement except as expressly set forth and governed by the Plan," [*Id.* at ¶ 8.1], *O'Brien* involved assets of a trust company that remained under the control and direction of the chancery court. It did not involve the interpretation of powers granted a liquidation agent in a plan or in a trust document.

## CONCLUSION

For the reasons discussed above, the court concludes that the Bank's advances to Debtors made between March 7, 2007, and September 13, 2007, were authorized by the Supplemental Order and that Toncee is barred from challenging the legal basis of that order. The court further concludes that neither the Final Financing Order nor the Supplemental Order authorize Debtors or the Liquidating Agent to obtain financing after November 2, 2007. However, the Plan and the SAI Trust do provide the Liquidating Agent authority to borrow money to the extent necessary or advisable to effectuate the purposes of the SAI Trust.

The court will set a further status hearing on the Motion to discuss what issues remain to be resolved and to develop a case management plan to resolve them in light of this memorandum of decision.

**IT IS THEREFORE ORDERED** that the court will hold a further status hearing on the Motion of Toncee, Inc. for an Order Compelling Bank of America to Disgorge Proceeds it has Received Post Confirmation from the Creditor Trust and for Accounting [Doc. # 1505] on **August 29, 2012, at 11:00 o'clock a.m.** in Courtroom No. 2, Room 111, 1716 Spielbusch Avenue, Toledo, Ohio 43604.

###