**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: April 1 2013**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 06-33227 |
| | ) | |
| SAI Holdings Limited, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| | ) | JUDGE MARY ANN WHIPPLE |

**MEMORANDUM OF DECISION REGARDING MOTIONS FOR SUMMARY JUDGMENT**

This case is before the court on motions for summary judgment filed by Bank of America, N.A. ("the Bank") [Doc. # 1622] and by the SAI Administrative Claim and Creditor Trust ("SAI Trust" or "Trust") [Doc. # 1620] with respect to the Motion of Toncee, Inc. for an Order Compelling Bank of America to Disgorge Proceeds it has Received Post Confirmation from the Creditor Trust and for Accounting ("Motion to Disgorge") [Doc. # 1505], and the responses to the motions for summary judgment filed by Toncee, Inc. ("Toncee") [Doc. ## 1630 & 1631]. For the reasons that follow, both motions for summary judgment will be denied.

**PROCEDURAL BACKGROUND**

On November 8, 2006, SAI Holdings, Limited, Sandusky Liquidating Company LLC, and Athol Manufacturing Corp. (collectively, "Debtors") each filed in this court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The court ordered that the cases be jointly administered.

On February 15, 2007, the court entered a final order authorizing post-petition financing from the

Bank ("Final Financing Order"). [Doc. # 396]. The debtor-in-possession credit facility ("DIP Credit Facility") authorized under the Final Financing Order consisted of a term loan ("Term Loan") and a revolving line of credit ("Revolving Credit Line"). [*Id.* at 9, ¶ 2]. The term note and line of credit note, together with any other loan or security documents executed in connection therewith, are defined in the Final Financing Order as the "Loan Documents." [*Id.*]. Pursuant to the Final Financing Order, as security for Debtors' obligations under the DIP Credit Facility ("Obligations"), the Bank was granted a security interest in all of Debtors' prepetition and postpetition assets, excluding causes of action arising under sections 544, 547, 548, 550, and 553 of the Bankruptcy Code ("Avoidance Actions"). [*Id.* at 10, ¶ 2, and 14, ¶ 5]. In addition, the Final Financing Order provides that the Obligations constitute claims with priority over any and all administrative expenses under the Bankruptcy Code or otherwise ("Superpriority Claims"). [*Id.* at 13, ¶ 4].

A supplement to the Final Financing Order ("Supplemental Order") was entered on September 13, 2007, which authorized Debtors to continue to obtain postpetition financing from the Bank through November 2, 2007, in order to fund expenses set forth in the budget attached to the Supplemental Order. [Doc. # 1016, p. 2, ¶ 2]. In addition to the liens granted pursuant to the Final Financing Order, the Supplemental Order grants the Bank a lien upon the Avoidance Actions in an amount up to $1,288,129. [*Id.* at 3, ¶ 4].

Pursuant to the Final Financing Order, Lear Corporation ("Lear") entered into a subordinated participation agreement ("Lear Participation Agreement") with the Bank with respect to a portion of the Revolving Credit Line. [*See id.* at 13, ¶ 3; Doc. # 1537, Toncee Oppos., Ex. 1[1]]. Under the Lear Participation Agreement, Lear agreed that it would purchase an undivided subordinated interest in the Revolving Credit Line in an amount capped at $5,706,968. [Doc. # 1537, Toncee Oppos., Ex. 1, ¶ 1]. Lear agreed that it would not be entitled "to any monies received by [the Bank] in accordance with the provisions of the Loan Documents" unless Bank of America was paid in full on the Term Loan and the Bank's portion of the "Revolving Loans," and "[the Bank's] loan commitments to Borrowers, if any, have been terminated."

---

[1] Generally, to be considered by the court at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(c). *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (citing *Oris v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993); *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990). Although the Lear Participation Agreement submitted in connection with Toncee's oppositions to summary judgment was not properly authenticated, *see*, *e.g.*, *United States v. Billheimer*, 197 F. Supp. 2d 1051, 1058 n.7 (S.D. Ohio 2002); *see also* Fed. R. Evid. 901-903, no party has objected to the document, so the court will consider it. *See Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 89 (6th Cir. 1993).

[*Id.* at ¶ 9]. "Borrowers" is defined as the Debtors in the underlying bankruptcy cases. [*Id.* at "Recitals," ¶ A]. "Revolving Loans" is defined to mean the outstanding principal "under the Revolving Credit Facility . . . as provided in the [Final Financing Order]," including unpaid interest and fees, all expenses and costs "arising from or related to the financing arrangements among Borrowers and [the Bank]" and "any other amounts due from Borrowers." [*Id.* at ¶ 6(d)(v)]. "Loan Documents" is defined as the Debtors' prepetition Business Loan Agreement and the Post Petition Credit Agreement. [*Id.* at Recitals, ¶ A].

Also pursuant to the Final Financing Order, any distribution to Lear under the Lear Participation Agreement is to be shared with Debtors' unsecured creditors ("Lear Carve Out"). [*Id.* at ¶ 14(b)]. The formula for the Lear Carve Out, as amended by the court in the Order Approving Compromise entered on February 26, 2008, requires that the first $450,000 paid under the Lear Participation Agreement be paid to unsecured creditors. [Doc. # 1277, pp. 2-3].

Under the Final Financing Order, the debt owed to Eastar, Inc. ("Eastar"), another secured creditor of Debtors, is subordinate to the portion of Debtors' obligations owed to the Bank that does not constitute Lear Participation. [Doc. # 396, Final Financing Order, p. 25, ¶ 14(a)]. The Final Financing Order provides that upon liquidation or sale of collateral securing the debt owed to Eastar, the net proceeds be applied first to the obligations owed to the Bank that do not constitute Lear Participations and, second, to obligations constituting Lear Participations and obligations owed to Eastar "on a pari passu basis, calculated based on the principal amount of Lear's DIP Participation and the principal amount of the Eastar Obligations, respectively." [*Id.*].

On November 8, 2007, the court entered an order confirming Debtors' First Amended Plan of Orderly Liquidation and Distribution ("Plan"). [Doc. # 1146]. Under the Plan, the claims of the Bank and of Lear under the Lear Participation, and the allowed secured claim of Eastar are to be paid in accordance with the terms of the Final Financing Order. [Doc. # 984, ¶¶ 2.1.1, 2.2.1, and 3.1.1]. On April 9, 2008, the court entered an order granting Toncee an allowed administrative expense claim in the total amount of $280,497.37. [Doc. # 1294].

The SAI Trust was formed pursuant to the Plan to provide the means and mechanism for the collection and liquidation of Debtors' assets.[2] All of Debtors' assets were vested in the Trust on the Plan's effective date, November 20, 2007. The Trust provides that the laws of Michigan shall govern the interpretation and all questions relating to management and administration of the Trust. [Doc. # 1550, § 8.5].

---

[2] Debtors' estates were substantively consolidated for all purposes under § 5.6 of the confirmed Plan. [Doc. # 984, ¶ 5.6].

Other provisions of the SAI Trust and other relevant documents and orders filed in this case are discussed in more detail in the court's analysis below.

In the Motion to Disgorge, Toncee seeks an order requiring the Bank to disgorge money that it has received from the Trust as repayment of certain advances made by the Bank to the SAI Trust. Toncee argues that the Bank is not entitled to a superpriority claim with respect to the moneys advanced by it post-confirmation and that such advances were made without authority on an unsecured basis. As such, Toncee contends that they should not have been repaid before administrative claim-holders are paid. Before engaging in discovery, the parties agreed that the court should first decide the threshold issue of whether the Plan and the Supplemental Order authorized the advances made by the Bank to Debtors and the SAI Trust and, if not, whether such authorization was required. After the parties filed additional briefs on those issues, the court entered a memorandum of decision finding, among other things, that the Supplemental Order authorized the challenged advances that were made through November 2, 2007. [Doc. # 1578, pp. 6-9]. The court further found that advances made by the Bank after November 2, 2007, were not authorized by the Final Financing Order or the Supplemental Order. [*Id.* at 10]. However, the court found that the provisions of both the Plan and the SAI Trust authorized the liquidating agent/trustee ("Liquidating Agent") to borrow funds to the extent "necessary or advisable to effectuate the purposes of the SAI Trust." [*Id.* (quoting Doc. # 1550, SAI Trust, ¶ 6.3(a)].

Toncee has since sought discovery from the Bank and the SAI Trust. In support of its Motion to Compel Discovery, filed as a result of the ensuing discovery dispute, Toncee argues that the requested discovery is directed at determining whether or not loans obtained from the Bank after November 2, 2007, were necessary or advisable. [Doc. # 1601]. However, as discussed below, it is the position of both the Bank and the SAI Trust that the Bank is entitled to judgment as a matter of law without a determination of whether the challenged loans were necessary or advisable.

## LAW AND ANALYSIS

**I. Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable in this contested matter by Federal Rules of Bankruptcy Procedure 7056 and 9013(c), summary judgment is proper only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, however, all inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586-88 (1986). The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, "and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party has met its initial burden, the adverse party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue for trial exists if the evidence is such that a reasonable factfinder could find in favor of the nonmoving party. *Id*.

## II. Motions for Summary Judgment

In their motions for summary judgment, both the Bank and the Trust argue, without citation to any authority, that there is no genuine issue as to whether the Liquidating Agent had authority post-confirmation to borrow funds from the Bank since, under the terms of the SAI Trust, a determination of whether the borrowing was "necessary or advisable to effectuate the purposes of the Trust" was committed to the Liquidating Agent's "sole judgment and discretion." [Doc. # 1550, SAI Trust , ¶ 6.3(a)]. The Bank and the Trust further argue, also without citation to any authority, that disgorgement by the Bank is not a proper remedy to the extent advances made to the Trust were not necessary or advisable. Finally, the Bank argues that this contested matter is futile since even if Toncee's arguments in its Motion to Disgorge are well taken, based on the subordination agreements of Lear and Eastar, Toncee will not recover any funds since Lear and Eastar must hold any funds received by them in trust for the benefit of the Bank until the Bank is paid in full. The court addresses each argument below.

### A. Liquidating Agent's "Sole Judgment and Discretion"

It is apparently the position of the Bank and the Liquidating Agent that the Liquidating Agent's exercise of his discretion in determining whether the post-confirmation loans were necessary or advisable to effectuate the purposes of the SAI Trust is not subject to review by the court. The court disagrees.

Toncee cites the Michigan Trust Code for the proposition that "sole" discretion does not preclude review for abuse. *See* Mich. Comp. Laws § 700.7815(1) ("notwithstanding the breadth of discretion granted to a trustee in the terms of the trust, including the use of such terms as "absolute," "sole," or "uncontrolled," a trustee abuses the trustee's discretion in exercising or failing to exercise a discretionary power if the trustee does any of the following: (a) Acts dishonestly, (b) Acts with an improper motive, even though not

5

a dishonest motive, (c) Fails to exercise the trustee's judgment in accordance with the terms and purposes of the trust."). While the Michigan Trust Code does not apply to liquidation trusts such as the SAI Trust, *see* Mich Comp. Laws § 700.7102 (providing that the Michigan Trust Code "applies to trusts as defined in section 1107") and § 700.1107 (defining "trust" to exclude liquidation trusts), common law trust principles similar to those set forth in § 700.7815(1) do apply. In determining common law trust principles where other authority is unavailable, Michigan courts often look to, and rely on, principles set forth in the Restatement of Trusts. *See, e.g., Stokes v. Rupert*, No. 298605, 2011 WL 3761459, *1 (Aug. 25, 2011); *Hein v. Hein*, 214 Mich. App. 356, 359-60 (1995); *Coverston v. Kellogg*, 136 Mich. App. 504 (1984).

The Restatement (Third) of Trusts provides that "[w]hen a trustee has discretion with respect to the exercise of a power, its exercise is subject to supervision by a court only to prevent abuse of discretion." Restatement (Third) of Trusts § 87 (2007); *see also Detroit Bank & Trust Co. v. St. Augustine Nat'l Bank*, 391 Mich. 706, 709-12 (1974) (reviewing trustee's exercise of "sole discretion" and "uncontrolled discretion" to determine if such discretion was exercised in accordance with the provisions of the trust). The principle set forth in §87 is identical to that set forth in Restatement (Second) of Trusts § 187 (1959) and Restatement of Trusts § 187 (1935), both of which are cited approvingly by Michigan courts. *See, e.g., Miller v. Dept. of Mental Health*, 432 Mich. 426, 436 n.20 (1989)*; Detroit Trust Co. v. Mason*, 309 Mich. 281, 306 (1944); *Childress v. Angel*, 194 Mich. App. 319, 323 n.2 (1992). While a court's review may be limited, "[e]ven under the broadest grant of fiduciary discretion, a trustee must act honestly and . . . in a state of mind contemplated by the settlor." Restatement (Third) of Trusts § 87, comment d. Thus, "courts will intervene to prevent trustees from acting in bad faith, or without regard to the terms and purposes of the trust or the interests of its beneficiaries, or for some purpose or motive other than the accomplishment of the purposes of the discretionary power." *Id.*

In this case, the provision of the SAI Trust granting the Liquidating Agent the power to take any actions as, in his "sole judgment and discretion, are necessary or advisable to effectuate the purposes of the SAI Trust" itself is prefaced by "[s]ubject to the provisions and limitations of this SAI Trust." [Doc. # 1550, § 6.3(a)]. According to Toncee, the Liquidating Agent's exercise of discretion in obtaining post-confirmation loans from the Bank is subject to review to determine whether it was within the terms and purposes of the SAI Trust. Under the reasoning of the authority cited above and under the provisions of the Trust itself, the court agrees.

**B. Remedy of Disgorgement by the Bank**

6

Without citation to any authority, the Bank and the Trust contend that even if the post-confirmation loans were not "necessary or advisable," disgorgement by the Bank of funds transferred to it as repayment of those loans is not a proper remedy. According to the Bank, the only potential remedy would be a claim against the Liquidating Agent. Toncee, for its part, argues that when a trustee acts outside the authority granted under the terms of the trust, the party harmed may pursue the recipient of an unauthorized transfer.

In *Gibney v. Allen*, 156 Mich. 301 (1909), cited by Toncee in support its argument, defendant Allen, acting as trustee of trust property, borrowed money from the defendant bank and granted mortgages on trust property. *Id.* at 304-05. Allen later discussed with bank representatives a question regarding the legality of the mortgages and then sold to the bank real estate owned by the trust for less than adequate consideration in an amount that was practically the amount of the notes and mortgages. *Id.* at 310, 316. The court found that Allen had no authority to borrow money or to give mortgages and that any authority to sell real estate was limited to sales "as in the due administration of [the] estate were necessary or proper." *Id.* at 315-16. The court found that the bank knew it was dealing with a trustee in relation to trust property so as to put it upon inquiry and that such inquiry would have disclosed Allen's lack of authority. *Id.* at 316. The court further found that the sale of real estate was not a bona fide sale but, rather, the bank's attempt when it discovered that the mortgages were worthless to avoid a probable loss. *Id.* The court concluded that the beneficiaries were entitled to the requested relief and held that "all of the sales, contracts and mortgages made by defendant Allen of and in relation to [the] trust property were void and should be set aside" and "that the moneys received by defendant Allen from the bank are no charge against the trust estate." *Id.* at 317.

The modernized rule as set forth in the Restatement (Third) of Trusts is that third parties have no duty to inquire into the extent or exercise of the trustee's powers. Restatement (Third) of Trusts § 108(3)(a); *see also* Mich. Comp. Laws § 700.7912(2) (2010) ("A person other than a trust beneficiary who in good faith deals with a trustee is not required to inquire into the extent of the trustee's powers or the propriety of the exercise of the powers."). However, left unchanged is the liability of a third party who, like the bank in *Gibney*, participates in a trustee's breach of trust with knowledge of such breach. *See* Restatement (Third) of Trusts § 108(1) ("A third party is protected from liability in dealing with or assisting a trustee who is committing a breach of trust if the third party does so without knowledge or reason to know that the trustee is acting improperly."); *see also* Restatement (Second) Trusts §§ 284, 321-326 (each limiting third party liability for participating in particular breaches of trust by the trustee to doing so with knowledge or notice of the breach of trust); *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251

7

(2000) (explaining that the common law of trusts permits a beneficiary to maintain an action for restitution of property or disgorgement of proceeds when a trustee, in breach of his fiduciary duty to the beneficiary, transfers trust property to a third person, unless the third person has purchased the property for value and without notice of the fiduciary's breach of duty).

Under this authority, the court agrees with Toncee that disgorgement of Trust funds transferred to the Bank in payment of the challenged loans is proper to the extent that the Liquidating Agent acted beyond the authority granted him in the SAI Trust when borrowing money from the Bank and the Bank loaned the money with knowledge or notice of the breach of trust. Thus, the Bank and the Trust are not entitled to judgment as a matter of law based on their argument that disgorgement by the Bank is never a proper remedy.

### C. Question of Futility of Contested Matter

The Bank finally argues that this contested matter is futile since even if Toncee prevails on its Motion to Disgorge, there is no scenario in which funds would be paid to Toncee or any administrative or unsecured creditor.

The Bank does not support the factual assertions in support of its argument with any evidence or citation to the record. *See* Fed. R. Civ. P. 56(c)(1) (requiring factual disputes to be established by citation to the record). Nevertheless, it states, and Toncee assumes for purposes of its argument in opposition to the motions, that, as of November 20, 2007, the effective date of Debtors' Chapter 11 plan, the Bank was owed $7,757,557 on it claims, excluding the Lear Participation. [*See* Doc. # 1622, p. 4, ¶ 10]. The Bank also states in its motion for summary judgment that between November 20, 2007, and the date of Toncee's Motion to Disgorge, the Bank advanced $4,295,588 to the Trust. [*See id.* at 4, ¶ 11]. The Bank states that, since November 20, 2007, the Bank has received a total of $9,449,030, of which $8,729,213 was applied to principal and $719,817 was applied to accrued interest and that there remains due and owing the Bank the sum of $3,323,952. [*Id.* at ¶¶ 12 & 13]. Finally, according to the Bank, Lear and Eastar have total claims in the principal amount of approximately $10,800,000. [*Id.* at 10].

According to Toncee, based on these figures, funds paid to the Bank in excess of the amount owed as of November 20, 2007, or $971,656, should be disgorged by the Bank ($8,729,213 applied to principal less $7,757,557, the amount owed on November 20, 2007). The Bank, on the other hand, argues that even if it is required to disgorge and pay to the SAI Trust the entire amount it received after November 20, 2007, Toncee would recover nothing. The Bank's argument is based solely on the fact that the agreements of Lear and Eastar subordinating their secured claims to the Bank's right to be paid in full requires Lear and Eastar

8

to hold any funds received by them in trust for the benefit of the Bank until the Bank is paid in full. The Bank then argues that the Liquidating Agent would be required to disburse the disgorged funds to Lear and Eastar, the next secured creditors in priority, who would in turn be required to hold the funds in trust for the benefit of the Bank. The Bank's argument, however, is flawed in several respects.

First, under the Lear Participation Agreement and the Eastar subordination agreement,[3] the debts owed to Lear and Eastar are subordinate only to debts owed by Debtors to the Bank, not the SAI Trust. Specifically, Eastar agreed to subordinate the secured debt owed to it by Debtors to the Bank's "right of payment to the full and final payment of the Obligations in cash." [Doc. # 1537, Ex. E, Amended Subordination Agreement, § 3(a); Doc. # 396, Final Financing Order, ¶ 14(a)]. "Obligations" is defined in the subordination agreement in terms of duties owed by any "Borrower;" and "Borrowers" is further defined as Debtors. [Doc. # 1537, Ex. E., p. 1, ¶ 1 and pp. 2-3, § 1]. "Obligations" is also defined in the Final Financing Order in terms of obligations and liabilities of Debtors to the Bank under the Loan Documents and the Final Financing Order.  [Doc. # 936, p. 10, ¶ 2].

Similarly, under the Lear Participation Agreement, Lear agreed that it would receive no payment of its interest in the Revolving Credit line "unless and until [the Bank] has been repaid in full on the Term Loan under the Loan Documents, [the Bank's] portion of the Revolving Loans shall have been irrevocably repaid in full and all other costs, expenses . . .fees due from Borrowers to [the Bank] have been irrevocably paid in full and [the Bank's] loan commitments to Borrowers, if any have been terminated." [Toncee Ex. 1, ¶ 9] "Borrowers" is specifically defined to mean Debtors. [*Id.* at 1, Recitals, ¶ A]. Likewise, "Revolving Loans" is defined to include only amounts owed by Debtors. [*See id.* at ¶ 6(d)(v)].

Both the Eastar subordination agreement and the Lear Participation Agreement require Eastar and Lear to hold in trust for the benefit of the Bank only payments they receive contrary to their agreements. [[Doc. # 1537, § 4(c); Toncee Ex. 1, ¶ 9] ]. Thus, to the extent that the challenged post-confirmation loans are obligations of the Liquidating Agent or SAI Trust and not of Debtors, as suggested in the Bank's unsupported recitation of facts, [*see* Doc. 1622, p. 4, 11], neither Lear nor Eastar are required to hold in trust for the Bank any amounts paid to them by the Liquidating Agent in the event the Bank is required to disgorge funds that it has received as payment of those loans.

---

[3] The Eastar subordination agreement referred to in this opinion is the Amended Subordination Agreement dated July 18, 2006, that is attached as exhibit E to the Bank's opposition to Toncee's Motion to Disgorge. [*See* Doc. # 1537, Ex. E]. Although the court's interim financing orders and Final Financing Order state that obligations owed by Debtors to Eastar are subject to both the Amended Subordination Agreement and a Second Amended Subordination Agreement dated November 9, 2006, [*See* Doc. # 396, p. 7 ¶ G], the Second Amended Subordination Agreement is not part of the record before the court to which any party has cited.

Also, the subordination of Lear's right to payment as set forth in the Lear Participation Agreement is a subordination only of Lear's entitlement to monies received by the Bank "in accordance with the provisions of the Loan Documents." [Toncee Ex. 1, ¶ 9]. "Loan Documents" is defined in the Lear Participation Agreement as Debtors' prepetition Business Loan Agreement and the Post-Petition Credit Agreement. [*Id.* at Recitals, ¶ A]. Thus, to the extent that the Bank has received funds other than in payment of the prepetition debt owed by Debtors or under the Post-Petition Credit Agreement, which, of course, would be the case if it received funds in payment of post-confirmation loans, Lear's subordination agreement has no effect.

Accordingly, because there are circumstances where Eastar and Lear may receive payments that are not subject to their subordination agreements with the Bank and, thus, would not be required to hold the funds received by them in trust for the benefit of the Bank, which is the sole basis advanced by the Bank in arguing the futility of Toncee's Motion to Disgorge, and because the Bank has not otherwise met its burden of demonstrating that there is no dispute that such circumstances do not exist, the Bank is not entitled to summary judgment based on the futility of the Motion to Disgorge.

**THEREFORE,** for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that the SAI Trust's motion for summary judgment [Doc. # 1620] be, and hereby is, **DENIED**; and

**IT IS FURTHER ORDERED** that Bank of America, N.A.'s motion for summary judgment [Doc. # 1622] be, and hereby is, **DENIED.**

###